IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JASON O. BILLUPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-cv-815-TFM |
| | ) | [wo] |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On October 23, 2008, Jason O. Billups ("Plaintiff" or "Billups") applied for supplemental security income under Title XVI and disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"). On November 6, 2008 Billups filed an application for child's insurance benefits. In all three applications, Billups alleged a disability onset date of April 1, 2008. (Tr. 113-23). After being denied, Billups timely filed for and received a hearing before an administrative law judge ("ALJ") who rendered an unfavorable decision on November 22, 2010. (Tr. 18-32). The Appeals Council denied Plaintiff's request for review. (Tr. 1-5). As a result, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner"). *Id.* Judicial review proceeds pursuant to 42 U.S.C. § 405(g), and 28 U.S.C. § 636(c). After careful scrutiny of the record and briefs, for reasons herein explained, the Court AFFIRMS the Commissioner's decision.

## I. Nature of the Case

Billups seeks judicial review of the Commissioner's decision denying his application for disability insurance benefits. United States District Courts may conduct limited review of such decisions to determine whether they comply with applicable law and are supported by substantial evidence. 42 U.S.C. § 405. The Court may affirm, reverse and remand with instructions, or reverse and render a judgment. *Id*.

## II. Standard of Review

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).  The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).  There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

## III. STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[1]  *See* 42 U.S.C. § 423(a).  The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program.  SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.[2]  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986).  Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

---

[1] DIB is authorized by Title II of the Social Security Act, and is funded by Social Security taxes. *See* Social Security Administration, Social Security Handbook, § 136.1, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

[2] SSI benefits are authorized by Title XVI of the Social Security Act and are funded by general tax revenues.  *See* Social Security Administration, Social Security Handbook, §§ 136.2, 2100, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004).  Claimants establish a prima facie case of qualifying for disability once they meet the burden of proof from Step 1 through Step 4.  At Step 5, the

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform.  *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC").  *Id.* at 1238-39.  RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence.  *Id.*  It also can contain both exertional and nonexertional limitations.  *Id.* at 1242-43.  At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform.  *Id.* at 1239.  To do this, the ALJ can either use the Medical Vocational Guidelines[4] ("grids") or hear testimony from a vocational expert ("VE").  *Id.* at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual.  *Id.* at 1240.  Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."  *Id.*

## IV.  ADMINISTRATIVE FINDINGS AND CONCLUSIONS

Plaintiff was born in 1986 and was 22 on his alleged onset date and was 24 at the time of the ALJ's decision.  (Tr. 18, 32).  He completed eleventh grade while enrolled in special education courses (Tr. 42), and his past work consisted of various fast-food worker positions.

---

[4] *See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F.R. § 416.969 (use of the grids in SSI cases).

(Tr. 228).  School records demonstrate that in June 2007,  a school official determined that Plaintiff has dyslexia with weak listening comprehension abilities.  (Tr. 269, 270).

At the hearing before the ALJ, Plaintiff was represented by George Taylor, a non-attorney.  (Tr. 18).   Plaintiff testified at the hearing that he had problems concentrating and heard voices.  (Tr. 46).   He said he had his driver's license and drove, but "[n]ot that often" (Tr. 43) and that he usually just stayed home because his medication made him "sleepy" (Tr. 44).  He said he mostly kept to himself, but when he had been working, he had been able to be around other people some of the time (Tr. 46-47).  Plaintiff testified that he was able to wash dishes, do laundry, but not fold or iron, take out the trash, and mop, but he said this was about all the chores he could do.  (Tr. 47-49).  He said he liked to watch cartoons (Tr. 49). He also testified that he shopped for groceries with his mom. (Tr. 49).  He said that he began collecting unemployment after he was laid off from his fast-food job the previous year, and that he was still collecting unemployment at the time of the hearing.  (Tr. 43).  He testified that his mom helped him complete his unemployment application.  (Tr. 43).

A vocational expert testified that a hypothetical individual of Plaintiff's age, education, and work experience, who could perform simple work involving one-and-two step functions and could occasionally interact with the general public, could perform Plaintiff's past work as a fast-food worker.  (Tr. 52). The ALJ found that Billups had not engaged in substantial gainful activity since his April 2008 alleged onset date, and that Plaintiff had severe impairments – dyslexia, affective disorder, and paranoid schizophrenia with psychosis – that did not meet or equal the criteria of a listing at 20 C.F.R. pt. 404 subpt. P app. 1 (Tr.

20-27).  After considering the entire record, the ALJ found that Plaintiff could perform work at all exertional levels, but was limited to work involving simple one-and two-step functions and occasional contact with the public.  (Tr. 27-31).  Based on vocational expert testimony, the ALJ concluded that Plaintiff could perform his past relevant work as a fast-food worker. (Tr. 31).  Thus, the ALJ found Plaintiff not disabled within the meaning of the Act.  (Tr. 32).

Plaintiff submitted additional evidence to the Appeals Council, which consisted of a one-page letter written by Plaintiff's mother in which she stated that he was enrolled in special education, was traumatized from a young age due to various life occurrences, did not communicate well, was often fired from jobs, could not read, and was unable to complete his disability or unemployment forms on his own.  (Tr. 339).  The Appeals Council found that the additional evidence did not provide a basis for changing the ALJ's decision.  (Tr. 1-5).

Plaintiff also filed a Motion for leave to file evidence with this court.  (Doc. 3).  This court ordered briefs on the Motion and Plaintiff filed his brief seeking sentence six remand (Doc. 18) to which the Commissioner filed a response (Doc. 19).  This court granted the Motion for Leave to File Evidence to the extent it is probative of a sentence six remand under 42 U.S.C. 405 (g).  The court will address the Plaintiff's request for a sentence six remand at the end of this opinion.

## V. MEDICAL HISTORY

The first medical evidence in the record pertaining to Plaintiff's mental limitations is a December 2008 consultative psychological evaluation performed by Guy Renfro, Ph.D., which was ordered in connection with Plaintiff's disability application (Tr. 293-295).  Dr.

Renfro noted Plaintiff's limited vocational history of fast-food restaurant work, and that Plaintiff had not been able to maintain employment at any one job for very long.  Dr. Renfro performed a mental status examination and testing on Plaintiff, but noted that Plaintiff "did not put forth optimal effort on the tasks presented to him."  (Tr. 294).  Dr. Renfro further noted that Plaintiff "was quick to say that he did not know something or did not remember basic facts about himself or his family.  He did not know the date, month, or year."  *Id.*  Dr. Renfro added that Plaintiff "said he did not know [answers] to questions that are known typically even to individuals with mild mental retardation." (Tr. 295).  Dr. Renfro determined that Plaintiff had a full scale IQ of 50, but that this was "likely [a] low estimate[] of his intellectual functioning" based on Plaintiff's lack of effort.  (Tr. 295).  With those caveats, Dr. Renfro assessed that Plaintiff functioned in the mild range of mental retardation, and had limitations in his short-term memory skills, fund of information, attention and concentration, social judgment, and reasoning (Tr. 295).

The next month, state agency psychologist Gordon Rankart, Psy.D., reviewed Plaintiff's medical records – namely Dr. Renfro's report, as Plaintiff had not sought any psychiatric treatment during the relevant time period, (Tr. 297) – and opined that Plaintiff had mild mental retardation, but was capable of employment that involved simple tasks (Tr. 303-15).  Dr. Rankart also opined that Plaintiff could comprehend and recall brief and uncomplicated directions; could carry out short, simple instructions; could maintain attention and concentration adequately for two-hour period; and had adequate adaption abilities if changes were introduced gradually and work goals were simple.  (Tr. 317-20).

Beginning in August 2009 – over one year after Plaintiff's alleged onset date – Plaintiff began seeing William Freeman, M.D. for psychiatric treatment (Tr. 327-35). Plaintiff saw Dr. Freeman approximately once a month through April 2010 (Tr. 327-35).  At those visits, Dr. Freeman noted that Plaintiff's psychiatric symptoms came and went.  At some visits, he noted that Plaintiff denied psychosis and his mental processes were within normal limits (Tr. 329, 331, 333, 334), but at other visits, Dr. Freeman noted that Plaintiff was experiencing psychosis and was "not good" (Tr. 330).  Dr. Freeman adjusted Plaintiff's psychiatric medications.

In February 2010, Dr. Freeman completed a disability questionnaire in support of Plaintiff's disability application (Tr. 322-26).  In the questionnaire, Dr. Freeman checked boxes indicating that Plaintiff had all of the listed affective disorders and had extreme limitations in all areas of work-related functioning.  Dr. Freeman also opined that Plaintiff was likely to miss four days of work a month, that his condition will deteriorate under stress, and that Plaintiff was mentally retarded, but noted that he did not have any documentation of Plaintiff's actual IQ.  Dr. Freeman concluded that Plaintiff could not sustain full time work due to his schizophrenia, affective disorder, and mental retardation.  (Tr. 322-26).

## VI.  ISSUES

Billups raises five issues for judicial review:

(1) Whether the ALJ's RFC is supported by substantial evidence.

 (2) Whether the ALJ erred in giving "great weight" to medical opinions which Plaintiff claims prevented the performance of his past relevant work.

(3)  Whether the ALJ failed to consider the effects of Mr. Billups medications on his ability to work.

(4)  Whether the ALJ's 12.05C rationale is inadequate and requires reversal.

(5)  Whether the Commissioner's decision should be reversed because the Appeals Council erroneously denied Mr. Billups' request for review in light of the material evidence submitted thereto.

.

## VII.  ANALYSIS

Plaintiff argues that the ALJ incorrectly found that he has the RFC to perform work at all exertional levels but was limited to work involving simple one- and two-step functions and occasional contact with the public, (Tr. 27-31) and incorrectly concluded that, based on vocational expert testimony, Plaintiff could perform his past relevant work as a fast-food worker.  (Tr. 31).   Specifically, Plaintiff argues that this finding is not based on substantial evidence because the ALJ did not credit the opinion of his treating psychiatrist, Dr. William Freeman, that Mr. Billups' mental impairments imposed *extreme* limitation of functioning with respect to mental activities required for work activity.   (Tr. 324, Medical Source Statement (Mental))**.**  (Doc. 21 at pp. 4-8).  He further argues that the ALJ erred because the medical opinions to which the ALJ granted "great weight" actually prevented the performance of Mr. Billups' past relevant work and the ALJ failed to consider the side effects of Plaintiff's medications on his ability to work.  (Doc. 21 at pp. 8-10).

A residual functional capacity assessment is used to determine the claimants' capacity

to do as much as they are possibly able to do despite their limitations. *See* 20 C.F.R. § 404.1545(a)(1) (2010). An RFC assessment will be made based on all relevant evidence in the case record. *Id.*; *Lewis v.* 125 F.3d at 1440. At an ALJ hearing, "the [ALJ] is responsible for assessing [the claimant's] residual functional capacity." 20 C.F.R. § 404.1546(c) (2010). The claimant is "responsible for providing the evidence [the ALJ] will use to make a finding about [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(a)(3) (2010). The ALJ is "responsible for developing [the claimant's] complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [their] own medical sources. *Id.; Holladay v. Bowen,* 848 F.2d 1206, 1209-10 (11th Cir. 1988) (The ALJ is not required to order a consultative examination unless the record establishes it is necessary to render a fair decision). The ALJ's finding must be supported by substantial evidence. "Substantial evidence is less than a preponderance, but rather such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Moore v. Barnhart,* 405 F.3d 1208, 1211 (11th Cir. 2005)(citations omitted).

The record includes a consultative psychological evaluation performed by Dr. Guy Renfro. (Tr. 293-295). The ALJ referred to this evaluation noting Dr. Renfro's observation that Plaintiff did not put forth full effort during the examination and testing; and therefore, Plaintiff's testing scores "likely underestimate[d] [] his actual intellectual functioning." (Tr. 22, 295). Even so, Dr. Renfro estimated that Plaintiff is functioning in the mild range of mental retardation. (Tr. 295). The ALJ concluded that Plaintiff was limited by his mental

impairments, but that Dr. Renfro's opinion supported a finding that Plaintiff could perform simple, one- and two-step functions despite his limitations.

The record also contains the medical records of Dr. Freeman, Plaintiff's treating psychiatrist, documenting psychiatric treatment from July 16, 2009 thru April 23, 2010. Dr. Freeman diagnosed Mental Retardation (Provisional) and Affective Disorder (Mood) NOS and Paranoid Schizophrenia with Psychosis and prescribed medications for the two later conditions. (Tr. 321-22). Based on his treating relationship, Dr. Freeman provided medical opinions of record expressing that Mr. Billups' multiple mental impairments would prevent him from being able to work a full-time job (8 hours a day, 40 hours per week). (Tr. 322). Dr. Freeman also completed a Medical Source Statement (Mental) opining that Mr. Billups' mental impairments imposed extreme limitation of functioning with respect to mental activities required of work activity. (Tr. 324).

The Eleventh Circuit has established that the opinion of a treating physician "'must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'" "'[G]ood cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart,* 357 F.3d at 1241(citing *Lewis,* 125 F.3d at 1440). In *Lewis*, the Eleventh Circuit also established that the ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician and that the failure to do so constitutes reversible error. 125 F.3d at 1440. Furthermore, a treating physician's opinion will be given controlling weight if it is well

supported by medically acceptable clinical and diagnostic techniques and is consistent with other evidence in the record. *Holley v. Chater*, 931 F. Supp. 840, 849 (S.D. Fla. 1996) (citing *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991)).

However, the simple fact that a treating physician's opinion is included in the evidence does not require the ALJ to follow it but rather the opinion may be given less weight or dismissed entirely. *Washington v. Barnhart*, 175 F. Supp. 2d 1340, 1346 (M.D. Ala. 2001) (finding that the ALJ properly considered the treating physician's medical opinions based on the objective medical evidence in the record as a whole it was "entirely reasonable" when the treating physician's records and notes were inconsistent). When an ALJ chooses to reject the opinions of the claimant's treating physicians there needs to be sufficient detail set forth by the ALJ for the court to conduct a meaningful review. *Pettaway v. Astrue*, Case No. 06-00880-WS-B, 2008 WL 1836738, at *14 (S.D. Ala. Apr. 21, 2008) (finding that the ALJ erred in rejecting the opinions of a treating physician because insufficient detail was set forth by the ALJ for the reviewing court to be able to conduct any kind of meaningful analysis).

The ALJ identified "good cause" to discount the treating doctor's opinion. (Tr. 19, 418). Indeed, the ALJ found that Dr. Freeman's opinion was not consistent with his own treatment notes (Tr. 30-31). Dr. Freeman noted that Plaintiff made some improvement during his course of treating Plaintiff. The records reflect that this improvement corresponded with Plaintiff's compliance with his medications and conversely reflect a decline when Plaintiff failed to comply. (Tr. 327-334). *See Winschel v. Comm'r of Soc.*

*Sec.,* 631 F.3d 1176, 1179 (11th Cir. 2011)(good cause exists to discount a treating physician's opinion when it is not bolstered by the evidence, evidence supported a contrary finding, or the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.) (Citations omitted.)

Further, the ALJ found that Dr. Freeman's opinion was inconsistent with the rest of the medical evidence.  (Tr. 30-31). *Wilson v. Heckler,* 734 F.2d 513, 518 (11th Cir. 1984) (a treating physician's opinion is generally entitled to more weight that a consulting physician's opinion; however, an ALJ may reject treating physician's opinion when it is contrary to the evidence.)  The ALJ correctly noted Dr. Freeman's opinion that Plaintiff had "extreme" limitations in all basic mental activities required to work was inconsistent with Plaintiff's daily activities (including driving and grocery shopping (Tr. 43, 47-49)), his past work activity (Tr. 228), and his ability to collect unemployment (Tr. 43), which requires sending out resumes and going on job interviews (Tr. 31).  Moreover,  Dr. Renfro, upon examination of Plaintiff on December 18, 2008, noted that "he did not display any signs of psychotic symptoms".  (Tr.295)   *Moore v. Barnhart,* 405 F. 3d 1208, 1212 (11th Cir. 2005) (court found no reversible error where ALJ articulated specific reasons for discounting treating physician's opinion, including physician's failure to account for claimant's diverse daily activities or give any specific assessment of claimant's functional capacity, and physician's opinion in a short form was used to support claimant's food stamp eligibility).

Additionally, the ALJ found that Dr. Freeman's opinion was internally inconsistent. The ALJ noted that Dr. Freeman opined that Plaintiff had a mental incapacity evidenced by

"an inability to follow directions such that the use of standardized measures of intellectual functioning [was] precluded," yet also opined that Plaintiff had a full scale IQ of 60 to 70. (Tr. 31, 326). The ALJ correctly stated that it is impossible for Plaintiff to be so limited that he was precluded from the use of standardized measures to test his IQ, but had a verified IQ of 60-70. (Tr. 31). Even though Dr. Freeman noted that he did not have actual documentation of Plaintiff's IQ, the additional testing by Dr. Renfro demonstrated that Plaintiff had the ability to follow directions well enough to use standardized measures to test his functioning. (Tr. 31, 293). Also, the ALJ noted that Dr. Freeman's opinion regarding Plaintiff's functional abilities was not based on IQ testing or scores, but rather was based on Plaintiff's subjective complaints and his observations. (Tr. 31, 326). *See* 20 C.F.R. §404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion"); *ct. Crawford v. Comm'r of Soc. Sec.,* 363 F. 3d 1155, 1159 (11th Cir. 2004) (substantial evidence supported ALJ's decision to discount treating physician's opinion when, in addition to other reasons, the opinion appeared to be based primarily upon plaintiff's subjective complaints of pain.).

After careful consideration of the Plaintiff's medical records, the Court finds that the ALJ correctly gave Dr. Freeman's opinions "little weight" based upon the reasons explained above. (Tr. 31). Moreover, conclusory opinions such as Dr. Freeman's about a claimant's ability to work are not entitled to significant weight, as this is a decision reserved solely for the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(1)-(3) (treating source opinions on issues

that are reserved to the Commissioner are not entitled to and special significance); *Caulder v. Bowen,* 791 F. 2d 872, 878 (11th Cir. 1986) (physician's statement that claimant is disabled is not dispositive of the issue of disability but must be considered in the Commissioner's examination of the totality of the evidence).  Thus, the court finds "good cause" exists for the ALJ to reject Dr. Freeman's opinion.   Accordingly, based on the evidence as a whole the Court concludes that the ALJ's determination of the RFC is supported by substantial evidence.  *See Phillips,* 357 F.3d at 1232 (quoting 20 C.F.R. § 404.1520 (e) (the ALJ will "assess and make a finding about the [claimant's] residual functional capacity based on all the relevant medical and other evidence")).

Next, Plaintiff argues that the medical opinions to whom the ALJ gave "great weight" actually support his claim of disability.  (Doc. 21 at p. 8).  The ALJ gave great weight to Dr. Gordon Rankart, the State agency mental residual functional capacity consultant.  (Tr. 30). Dr. Rankart opined that Plaintiff could perform simple work involving brief and uncomplicated directions; short, simple instruction; maintain attention and concentration for two-hour periods; and could handle changes if they were introduced gradually. (Tr. 317-20). The ALJ found that Dr. Rankart's opinion was consistent with the record as a whole.  Based upon the extended discussion above of the medical evidence as a whole, the court concludes that the ALJ reasonably found Dr. Rankart's opinion consistent with the record as a whole, including  Dr. Freeman's treatment notes, Dr. Renfro's opinion where he noted that Plaintiff failed to give full effort on his WAIS-III exam, and the record evidence of Plaintiff's daily activities and past work history.  *Ogranaja v. Comm'r of Soc. Sec.,* 186 F. App'x 848, 851

(11th Cir. 2006) (unpublished) (The ALJ could give great weight to state agency physicians where the expert opinions of the state agency physicians were supported by and consistent with the record as a whole).  Also, while the ALJ did not incorporate Dr. Rankart's assessed limitations verbatim, he found that Plaintiff could perform simple one-and two-step tasks, which by definition, largely incorporate Dr. Rankart's assessed limitations.  *See* 2 0 C.F.R. § 404.1568(a).  Moreover, there is no requirement that an ALJ adopt an expert opinion verbatim, when determining a Plaintiff's RFC.  *Lewis,* 125 F.3d at 1440 (the residual functional capacity assessment is an assessment based on all the relevant evidence of a claimant's remaining ability to work despite her impairments.)

Next, Plaintiff argues that the ALJ erred by failing to consider the effects of Billups's medications upon his ability to work.  (Doc. 21 at pp.8-10).  Specifically, Plaintiff testified that his medications make him "sleepy." (Tr. 44).  However, the court has carefully reviewed the record and finds there is no other record testimony or evidence, including Dr. Freeman's treatment notes, that Plaintiff experienced side-effects from his medication except for his own testimony.  The court notes that Dr. Freeman checked a box "yes" indicating that Plaintiff's medications affected his ability to work; however, Dr. Freeman failed to expand on this conclusion and provided no information as to how Plaintiff's medications affected his ability to work.  (Tr. 325).  Thus, the ALJ did not err in failing to conclude Plaintiff's sleepiness due to his medication limited his ability to perform a limited range of simple work.  *Swindler v. Sullivan,* 914 F. 2d 222, 226 (11th Cir. 1990) (when a claimant has not complained of medication side effects, and the record contains no complaints of side effects

to treating physicians, there is not substantial evidence to support a finding that side effects are a significant problem); *Holley v. Chater,* 931 F. Supp. 840, 850 (S.D. Fla. 1996) (when the sole evidence of side effects is Plaintiff's testimony, such "scant" evidence is insufficient to support a finding of disability).   Accordingly, the Court concludes that the ALJ's determination of the RFC is supported by substantial evidence.  *See Phillips,* 357 F.3d at 1232.

Plaintiff also argues that the ALJ's 12.05C rationale is woefully inadequate and the Commissioner's decision should be reversed on that basis.  (Doc. 21 at pp.10-12).  As correctly noted by the ALJ, the 12.05C listing requires a valid, full scale IQ of 60-70 and a physical or mental impairment imposing an additional and significant work related function. 20 C.F.R. pt. 404 subpt. P, app. 1 § 12.05C.  The ALJ concluded that Plaintiff did not meet or medically equal listing 12.05C because (1) IQ testing was unreliable given that Dr. Renfro explicitly noted  Plaintiff failed to give his full effort, and thus, the test was not necessarily valid; and (2) Plaintiff did not have any deficits in adaptive functioning as required by 12.05C . (Tr. 25-27).  The ALJ thoroughly discussed the Plaintiff's performance in the eleven skill areas where Plaintiff must demonstrate "significant limitation in adaptive function in at least two skill areas" in order to meet 12.05.  (Tr. 26-27).

Plaintiff, however, does not provide any arguments that he meest listing 12.05C. Rather, Plaintiff complains that in considering the eleven factors, the ALJ "inappropriately pick and chose pieces of evidence."  (Doc. 21 at pp. 10-11).  Specifically, he points to Dr. Freeman's single notation that Plaintiff "isolates to self" (Tr. 329) as support for the

conclusion that Plaintiff has "significant limitations in adaptive functioning" as to social skills.  However, the ALJ recognized in his RFC that Plaintiff needed to work in a situation with "only occasional contact with the public."  (Tr. 27).  Thus, the ALJ recognized Plaintiff's social impairments, but did not conclude based on the record evidence of Plaintiff's ability to communicate and cooperate at the hearing and his outings with his mother that Billups had "significant limitations in adaptive functioning" in the social skills area.  Viewing the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision, the Court concludes the ALJ did not err in his conclusion as to Plaintiff's social skill level.

Furthermore, Plaintiff complains that the ALJ failed to discuss his difficulties in school requiring special education intervention, when the ALJ considered his functional academic skills.  (Doc. 21 at p. 11).  However, the record shows that Plaintiff was able to complete the eleventh grade while enrolled in special education courses (Tr. 42).  Furthermore, the ALJ noted that Billups reported he sometimes uses a taxi for transportation and that he obtained a driver's license.  Finally, the ALJ noted that in January of 2010, Dr. Freeman noted that Billups judgment, insight, process, relatedness and associations were all within normal limits. (Tr. 26).  Viewing the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision, the Court concludes the ALJ did not err in his conclusion as to Plaintiff's functional academic skills.

Additionally, Plaintiff complains that the ALJ failed to give any evidentiary support for his conclusion that "[a]s to safety, the claimant is able to recognize dangerous situations."

(Tr. 27).  Even so, whether Plaintiff is able to recognize dangerous situations or not will not change the court's conclusion that Plaintiff failed to demonstrate that he met or equaled 12.05C.  Indeed, in light of Dr. Renfro's expressly stated concerns about Plaintiff giving his full effort when tested, which the ALJ acknowledged several times in his opinion, the court concludes Plaintiff has not demonstrated a "valid" IQ score meeting the 12.05C criteria.

Finally, Plaintiff argues that the Commissioner's decision should be reversed because the Appeals Council erroneously denied Billups request for review in light of material evidence submitted thereto.  (Doc. 21 p. 12-13).  After, the ALJ rendered an unfavorable decision, Plaintiff submitted a letter authorized by his mother where she stated that Plaintiff was enrolled in special education, was traumatized at a young age by certain situations, did not communicate well, was often fired from jobs, could not read, and was unable to complete his disability or unemployment forms on his own.  (Tr. 339).  This evidence, however, is mostly cumulative of the evidence before the ALJ which was incorporated into his decision. (S*ee, e.g.,* Tr. 21 (ALJ acknowledging Plaintiff was in special education courses), Tr. 43 (Plaintiff testifying his mother helped him with his unemployment forms.) The only new evidence is Plaintiff's mother's statement that he was assaulted by another student.   (Tr. 339).  This evidence does not cast doubt on the ALJ's decision that Plaintiff can perform the minimal demands of simple work.  Accordingly, the Court concludes that even in light of this additional evidence, the ALJ's decision is still supported by "relevant evidence as a reasonable person would accept as adequate to support [the] conclusion." *Moore,* 405 F.3d at 1211.

## VIII. SENTENCE SIX REMAND

Plaintiff also filed a Motion for leave to file evidence with this court.  (Doc. 3).  This court ordered briefs on the Motion and Plaintiff filed his brief seeking a sentence six remand (Doc. 18) to which the Defendant filed a response (Doc. 19).  This court granted the Motion for leave to file evidence to the extent it is probative of a sentence six remand under 42 U.S.C. § 405 (g).  The court will now consider whether Plaintiff's request for a sentence six remand is due to be granted.

Plaintiff argues that the administrative transcript which was before the ALJ had "gaping holes" in it due to the lack of Plaintiff's school records (Doc. 18 p. 1).  When considering whether a sentence six remand is proper, the court does not address the merits of the ALJ's decision itself.  Instead, a sentence six remand is limited to cases where a plaintiff shows that new evidence has come to light which was not available at the time of the administrative proceeding, and that the new evidence might have changed the outcome of the original proceeding.  *Melkonyan v. Sullivan,* 501 U.S. 89, 97-98 (1991).  Sentence six remand is appropriate only where a plaintiff submits new evidence and further shows that: (1) the new evidence is material to his disability; and (2) he had good cause for failing to submit the evidence earlier.   *See* 42 U.S.C. § 405 (g) (under sentence six a court may "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record"); *see also Melkonyan,* 501 U.S. at 99, 100.

The Court will summarize the additional evidence Plaintiff relies upon for his

sentence six remand request.   Specifically, this evidence includes Social Security correspondence (pp. 2-7, 166-70); school records dated from 1994-2006 (pp. 11-116); a one-page school transcript from 2012 (p.8); evidence of a school discrimination claim and a workplace discrimination claim filed by Plaintiff (pp.9-10, 164-65); medical records dated 1999-2011 (pp. 120-63); and other random correspondence (pp. 117-19).   Under the *Cherry* standard, the claimant must demonstrate (1) the evidence is new and noncumulative; (2) the evidence is material; that is relevant and probative so that there is a reasonable possibility that it would change the administrative result, and (3) there is good cause for failure to submit it at the administrative level.   *Caulder v. Bowen,* 791 F.2d 872, 877 (11th Cir. 1986)(citing *Cherry v. Heckler*, 760 F. 2d 1186 (11th Cir. 1985)).   The court has reviewed the evidence presented by Plaintiff and concludes that he fails to meet the *Cherry* standard and as a result his request for a sentence six remand is due to be denied.

Specifically, the Social Security correspondence (pp. 2-7, 117-19, and 166-70) provides no probative evidence of Plaintiff's alleged disability.  The work place and school discrimination claims filed in 2006 (pp. 9-10 and 164-65) likewise provide no probative evidence of Plaintiff's disability and furthermore predates the Plaintiff's alleged onset date of April 2008. The Plaintiff's school records (pp. 11-116) dated 1994-2006 also fail to provide material evidence of Plaintiff's disability claim for several reasons.  First, the evidence predates the relevant time period for the ALJ's decision – April 2008 through November 2010.  (Tr. 18-32).  Second, the evidence is cumulative because the ALJ considered Plaintiff's enrollment in special education classes.  (Tr. 21).   Also, the ALJ found that

Plaintiff had serve impairments of borderline intellectual functioning and dyslexia (Tr. 21), which is actually confirmed and bolstered by the evidence. Indeed, the evidence shows that a school worker noted that a diagnosis of mental retardation was rejected because Plaintiff's IQ was in the "low average range" (pp. 52, 79) and testing indicated that Plaintiff functioned in the low average range of intellectual functioning. (p. 91). Also, evidence that Plaintiff was at some point enrolled in Troy University as an undergraduate, but failed all of his classes (p. 8) provides no probative evidence of Plaintiff's disability.

The remainder of the evidence consists of medical records, some of which show that Plaintiff had early childhood and continuing throat and ear problems and had a tonsillectomy (pp.123-26 and 160) and went to the hospital for vertigo (pp. 161-164), but this evidence is not material to Plaintiff's claims concerning his mental impairments. Other medical records show that in March 2011, Plaintiff presented to the hospital with suicidal ideations and show that he was a victim of abuse by a classmate when he was 13 years old. (pp. 121-22 and 127-59). Plaintiff argues that this evidence establishes that he had schizophrenia and post traumatic stress disorder ("PTSD") (Doc. 18 at pp.2-3). However the ALJ concluded based upon Dr. Freeman's medical records (Tr. 322-36) and the record evidence as a whole, that Plaintiff had the severe impairment of paranoid schizophrenia with psychosis and affective disorder. (Tr. 21). Indeed, the additional medical evidence from Dr. Freeman, a letter dated May 2012, states that Dr. Freeman has treated Plaintiff for schizoaffective disorder since July 2009 and that Plaintiff was last seen on May 7, 2012 for medication management. (p. 119). Accordingly, the court concludes that the additional medical records are either not relevant to

Plaintiff's claims or are cumulative of the evidence which was before and considered by the ALJ. *See Melkonyan*, 501 U.S. at 98; *Caulder*, 791 F. 2d at 877.

Plaintiff acknowledges that this evidence "was in existence prior to the Appeals Council's notice of determination", but asks this court to find "good cause" for his failure to present the additional evidence until now based on "his intellectual deficiencies and schizophrenia with accompanying psychosis and PTSD." (Doc. 18 at p. 3). Plaintiff cites to no law which recognizes Plaintiff's mental deficiencies as good cause for failure to submit existing evidence at the administrative level. Moreover, Plaintiff makes no other argument to establish good cause for his failure to present this evidence. *See Cannon v. Bowen*, 858 F. 2d 1541, 1546 (11th Cir. 1988) (The good cause requirement is satisfied when the evidence did not exist at the time of the administrative proceedings). Accordingly, the court concludes that Plaintiff fails to demonstrate that a sentence six remand is appropriate in this instance and the court cannot consider newly-submitted evidence in determining whether the Commissioner's position is supported by substantial evidence. *See Melkonyan*, 501 U.S. at 98.

## IX. CONCLUSION

Pursuant to the findings and conclusions detailed in this Memorandum Opinion, the Court concludes that the ALJ's non-disability determination is supported by substantial evidence and proper application of the law. It is, therefore, **ORDERED** that the decision of the Commissioner is **AFFIRMED.**

A separate judgment is entered herewith.

DONE this 27th day of December, 2013.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE